FILED

2025 Aug-26  PM 03:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| **LINDA DARLENE HARRISON,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **Case No.: 6:24-cv-00031-ACA** |
| ] | |
| **SOCIAL SECURITY** ] | |
| **ADMINISTRATION** ] | |
| **COMISSIONER,** ] | |
| ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION

Plaintiff Linda Darlene Harrison appeals the decision of the Commissioner of Social Security finding her not disabled. (Doc. 1). Based on the court's review of the administrative record and the parties' briefs, the court **WILL AFFIRM** the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Harrison applied for disability insurance benefits in August 2021 alleging a disability beginning September 26, 2018 (doc. 6-7 at 11), but later amended her application to allege a disability beginning September 3, 2020 (doc. 6-3 at 37). The Commissioner denied Ms. Harrison's claim initially and on reconsideration (doc. 6-4 at 95, 105), and Ms. Harrison requested a hearing before an administrative law judge ("ALJ") (doc. 6-5 at 19–20). After the hearing (doc. 6-3 at 33–59), the ALJ

issued an unfavorable decision (*id*. at 18–27). The Appeals Council denied Ms. Harrison's request for review (*id*. at 2–4), making the Commissioner's decision final and ripe for the court's judicial review, *see* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotation marks omitted). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks omitted). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel*, 631 F.3d at 1178 (quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard of review, the court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267 (quotation marks omitted). The

court must reverse the Commissioner's decision if the ALJ does not apply the correct legal standards or "provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

To determine whether an individual is disabled, the Commissioner follows a five-step sequential evaluation. *Malak v. Comm'r of Soc. Sec.*, 131 F.4th 1280, 1283 (citing 20 C.F.R. § 404.1520). First, the Commissioner must determine if a claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is so engaged, he is not disabled and the analysis ends. *Id*. Otherwise, the second question is whether the claimant has either "a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe." *Id*. § 404.1520(a)(4)(ii). Severity means that the impairment or combination of impairments "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id*. § 404.1520(c). If the claimant lacks a severe impairment or combination of impairments, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). Otherwise, the analysis proceeds to the third step.

At the third step, the Commissioner must determine if the claimant's impairments meet or equal a list of impairments set out in the regulations. *Id*. § 404.1520(a)(4)(iii). If they do, the Commissioner must find the claimant disabled and the analysis ends. *Id*. § 404.1520(a)(4)(iii). If they do not, at the fourth step the

Commissioner must determine the claimant's residual functional capacity. *Id*. § 404.1520(e). If the claimant's residual functional capacity permits the claimant to perform past work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform past work, at the fifth step, the Commissioner must determine whether the claimant's residual functional capacity, age, education, and work experience permit an adjustment to other work. *Id*. § 404.1520(a)(4)(v). If such an adjustment is possible, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v).

## III.    EVIDENCE AND ALJ'S DECISION

The court begins by describing the evidence submitted to the ALJ, followed by the ALJ's decision. Ms. Harrison has received treatment for narcolepsy, supraventricular tachycardia, fibromyalgia, back pain, and depression. The court describes the treatment for each medical condition separately.

### 1.    Narcolepsy

Ms. Harrison was evaluated at Pulmonary and Sleep Associates of Jasper ("PSA") for narcolepsy in December 2017 on referral from her primary care doctor, Dr. Scott Dixon. (Doc. 6-10 at 36).  Sleep studies done at PSA confirmed narcolepsy without cataplexy and showed evidence of tachycardia, a rapid beating of the heart. (Doc. 6-10 at 41–42, 44). Ms. Harrison was prescribed Desoxyn to treat her narcolepsy. (*Id*. at 45, 49).

Ms. Harrison appeared for a follow up at PSA in 2020. The progress notes include narcolepsy without cataplexy, hypertension, and fibromyalgia in her past medical history. (Doc. 6-10 at 27). Ms. Harrison reported that she had "trouble sleeping at night" and "extreme sleepiness during the day." (*Id.*). The doctor diagnosed unspecified hypersomnia and sleep disturbance in addition to the previous diagnosis of narcolepsy without cataplexy and prescribed Wakix. (*Id.*). There is no further evidence that Ms. Harrison sought further treatment for her narcolepsy although her health care providers noted varying degrees of fatigue.

### 2.    Fibromyalgia and Back Pain

Ms. Harrison was seen by Dr. Quinn at North Central Neurology Associates in June 2018. (Doc. 6-10 at 8). She complained of headaches, fibromyalgia, weakness, and numbness at that visit. (*Id.*). The records note that Ms. Harrison was referred by her primary care physician, Dr. Dixon, and was also treated by Dr. William Bell, a rheumatologist. (*Id.*). According to the medical records "he [presumably either Dr. Dixon or Dr. Bell] wanted [Dr. Quinn] to more aggressively treat her pain." (*Id.*). Dr. Quinn switched an unspecified medication to Gralise and refilled her Cymbalta and Trezix. (*Id.* at 11). The notes indicate a plan to see Ms. Harrison against and the possibility that Ms. Harrison "may need additional scans and possible pain clinic referral." There are no further records from North Central Neurology Associates.

In November 2019, Ms. Harrison went to Premier Health for an initial visit and reported increased depression, pain and cramping in her legs, pain in her wrist, and the need to go back on Prevacid. (Doc. 6-10 at 19). The records do not reflect a discussion of, or treatment plan for, narcolepsy. (*Id.*). At a May 2020 telehealth visit, Ms. Harrison reported improvement with Celexa but requested and received an increased dose. (Doc. 6-10 at 23). The record indicates she disclosed her narcolepsy diagnosis but neither took nor requested medicine to treat it. (*Id.* ("narcolepsy—0 meds")).

Ms. Harrison was referred to Dr. Thao Tran at Southview Rheumatology in February 2021. (Doc. 6-12 at 9). Dr. Tran confirmed Ms. Harrison's fibromyalgia diagnosis after a physical examination, reviewing Ms. Harrison's previous medical records, interviewing Ms. Harrison, and reviewing X-rays of her back, shoulders, feet, and hips. (Doc. 6-12 at 11). Dr Tran prescribed only Tramodol instead of the Norco her previous doctors had prescribed. (*Id.* at 11). Because she was agreeable to trying Tramodol, he prescribed it with an offer to refer her to a pain management doctor if she continued to need Norco. (*Id.*).

Dr. Tran referred Ms. Harrison to the Comprehensive Pain Center in April 2021, and she was treated there by Dr. Ron Pitkanen until May 2022. (Doc. 6-10 at 89–130; doc. 6-11 at 94–150). At her initial visit, Ms. Harrison reported muscle aches, muscle weakness, swelling, neck pain, difficulty walking, cramps, and

osteoporosis as well as numbness, dizziness, headaches, depression, sleep disturbances, and restless sleep (Doc. 6-10 at 117). Her husband also stated that she had been very depressed. (*Id*. at 116). According to the medical records, the pain began 10 years before and she was prescribed Norco three times a day by her previous rheumatologist, Dr. Bell. (*Id*.). Ms. Harrison told Dr. Pitkanen that she attempted to manage her pain with chiropractic care and both opioid and nonopioid medications but must have Norco at night. (*Id*.). Dr. Pitkanen prescribed Butrans patches and ordered an MRI of her cervical and lumbar spine. (*Id*. at 117).

The MRI indicated multilevel degenerative changes and mild disc bulges involving the lower spine for which Dr. Pitkanen performed a cervical epidural steroid injection the following month. (Doc. 6-10 at 116, 123–24). One month later, Ms. Harrison returned and reported that the steroid injection was fifty percent effective for three weeks but the Butrans patches were ineffective. (Doc. 6-10 at 102–03). Ms. Harrison also noted that she was still interested in proceeding with a different injection. (*Id*. at 103). Dr. Pitkanen discontinued the Butrans patches and prescribed her Norco three times a day. (*Id*.).

Later that same month, Ms. Harrison returned and described her lower back and leg pain remained painful and her neck pain had returned. (*Id*. at 93). Dr. Pitkanen continued her on Gabapentin, Norco once a day as needed, conservative treatment measures, and scheduled an epidural steroid injection for the

7

following week. (*Id*.). From this appointment forward, Dr. Pitkanen's notes indicate that when Ms. Harrison typically reported an "acceptable" level of pain when she took her medication as prescribed. (*Id*. at 92, 102; doc. 6-11 at 98, 113, 122, 131, 140).

### 3.    SVT

Ms. Harrison began seeing cardiologist Dr. James Cavender for chest pain and shortness of breath beginning in 2019 and diagnosed her with supraventricular tachycardia in February 2020. (Doc. 6-11 at 42, 50, 53). Ms. Harrison was prescribed Metoprolol but continually reported periodic reports of chest pains or shortness of breath at her visits with Dr. Cavender. (*Id*. at 53, 54, 62, 63, 68). Testing and imaging of Ms. Harrison's heart at those visits all came back normal. (*Id*. at 63).

Outside of her appointments with Dr. Cavender, Ms. Harrison went to an urgent care clinic in February 2020 for shortness of breath and reported a history of SVT. (Doc. 6-10 at 60). An electrocardiogram ("EKG") performed on site revealed a normal sinus rhythm; an X-ray revealed increased interstitial markings. (*Id*. at 63). Ms. Harrison was released and instructed to follow up with the emergency department if her symptoms worsened. (*Id*.).

Ms. Harrison saw Dr. Sarah Anne Sandberg in October 2021 for an electrophysiology ("EP") study, is a series of tests that examine the heart's electrical activity. (Doc. 6-11 at 72); *See also EP Study,* MAYO CLINIC,

https://www.mayoclinic.org/tests-procedures/ep-study/about/pac-20384999    (last

visited August 4, 2025). Dr. Sandberg noted that Ms. Harrison reported increased

palpitations in the previous month but her watch did not indicate an elevated

heartrate. (*Id*.). Dr. Sandberg determined that Ms. Harrison's SVT episodes were

very short, "just a few beats." and noted that Ms. Harrison's palpitations were out of

proportion with her monitor data. (*Id*.). Regarding Ms. Harrison's complaint of

shortness of breath, Dr. Sandberg noted that Ms. Harrison's tests all returned normal.

(Doc. 6-11 at 75). Dr. Sandberg did not believe Ms. Harrison's shortness of breath

was related to her cardiac issues. (*Id*.).

Ms. Harrison's last appointment with Dr. Cavender was in March 2022. (Doc.

6-11 at 76). Ms. Harrison denied any chest pain or shortness of breath but

complained that her medication was making her fatigued. (*Id*.). Dr. Cavender

concluded that her medication was controlling her SVT and palpitations well. (*Id*. at

79).

### 4.    Depression

In July 2021, Ms. Harrison saw providers at Grayson and Associates

Psychiatry who noted her frequent sleepiness, depressed mood, low energy, low

interests, lack of motivation, focus problems, and irritability. (Doc. 6-11 at 90).

Based on this meeting, the provider diagnosed Ms. Harrison with depression and

anxiety as well as complex pain and narcolepsy. (*Id*. at 91). Her provider increased her medications to help with her anxiety, mood, sleep quality, and pain. (*Id*.).

Ms. Harrison saw her primary care physician, Dr. Scott Dixon in 2019 and 2020 and reported pain from a variety of chronic diseases as well as depression. (Doc. 6-10 at 19, 23). Dr. Dixon later prescribed Neurontin for her fibromyalgia and Cymbalta for her depression. (*Id*.). In 2020, Dr. Dixon prescribed Celexa for her depression with noted improvement. Dr. Dixon later prescribed her Gabapentin for her fibromyalgia. (*Id*.).

<u>5.    Hearing Before the ALJ</u>

At a hearing before the ALJ, Ms. Harrison testified about her narcolepsy, fibromyalgia, depression, and SVT. (Doc. 6-3 at 37–54). She stated that she has had narcolepsy since 1998 or 1999 and medication helped for a long time until her body became used to it and she exceeded the recommended dosage. (*Id*. at 38). She testified that she sleeps three to four hours from 8:00 a.m. to 5:00 p.m. and cannot focus when she is tired but she can force herself to stay awake for up to two hours at a time when she is in a lot of pain. (*Id*. at 39–41). Ms. Harrison testified that her fibromyalgia causes pain in her feet, thighs, shoulders, and neck that becomes excruciating when she sits or stands for more than thirty minutes at a time, but the pain is manageable when she takes her prescribed medication. (*Id*. at 41, 44, 46–47). Ms. Harrison testified that depression prevents her from concentrating and makes

her skin hurt when touched and the medicine that controls her SVT makes her tired. (Doc. 6-3 at 50, 52–53).

The ALJ determined that Ms. Harrison last met the insured status requirements of the Social Security Act on December 31, 2020 and did not engage in substantial gainful activity from September 3, 2020 through that date. (Doc. 6-3 at 20). The ALJ found that Ms. Harrison's SVT, cervical spondylosis, cervical radiculopathy, and narcolepsy were severe impairments. (*Id*. at 20–22). Ms. Harrison's depression and hypertension were also medically determinable impairments but non-severe. (*Id*. at 21–22). The ALJ found that Ms. Harrison's fibromyalgia was not medically determinable. (*Id*. at 22). The ALJ concluded that Ms. Harrison does not suffer from an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Doc. 6-3 at 22).

After considering the evidence in the record, the ALJ determined that Ms. Harrison "has the residual functional capacity to perform light work" with some additional exertional, postural, and environmental restrictions. (*Id*. at 22). In particular, the ALJ found, "[s]he would need the option to change position from upright . . . to sitting or vice versa as frequently as every 30 minutes while remaining on task." (Doc. 6-3 at 23). Based on her residual functional capacity and the testimony of a vocational expert, the ALJ found Ms. Harrison was unable to perform

any past relevant work through the date last insured (*id.* at 25), but was capable of performing jobs that exist in significant numbers in the national economy, such as cashier, router, and collator operator (*id.* at 26). Accordingly, the ALJ determined that Ms. Harrison had not been under a disability, as defined in the Social Security Act, from September 3, 2020 to December 31, 2020. (*Id.*).

## IV.    DISCUSSION

Ms. Harrison argues that the court should vacate and remand the Commissioner's decision on the grounds that: (1) the ALJ erred by failing to find that Ms. Harrison's back pain and fibromyalgia were medically determinable impairments; (2) the ALJ erred by finding that Ms. Harrison's depression was a non-severe medical impairment (3) the ALJ failed to properly evaluate Ms. Harrison's testimony about the severity of her pain. (Doc. 14 at 14–23).

The court will address each of these arguments in the order presented above.

### 1.    Back Pain and Fibromyalgia

Ms. Harrison argues that the ALJ erred by not finding that Ms. Harrison's back pain or fibromyalgia were medically determinable impairments. (Doc. 14 at 17–18). The Commissioner responds that Ms. Harrison forfeited any claims she was disabled due to back pain because she did not allege back pain in her application or at the hearing before the ALJ. (Doc. 15 at 9).

In unpublished cases, the Eleventh Circuit has held that an ALJ is "under no duty to consider [an] alleged impairment" when the claimant "did not allege—in either [the] application for benefits or at [the] hearing—that [such impairment] was a basis for [her] disability." *Duffy v. Comm'r of Soc. Sec.*, 736 F. App'x 834, 837 (11th Cir. 2018); accord *Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010). The court finds those decisions and the Eighth Circuit case on which they rely persuasive. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996); *McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022). Because Ms. Harrison did not allege that her back pain was a basis for her disability (*see* doc. 6-8 at 29; doc. 6-3 at 36–58), the ALJ was under no obligation to consider her back pain.[1]

As for Ms. Harrison's fibromyalgia, the ALJ did not err at step two because her determination that Ms. Harrison's fibromyalgia was not medically determinable was based on substantial evidence. Ms. Harrison contends that the ALJ failed to consider both evidentiary criteria set out in Social Security Ruling 12-2p ("SSR 12-2p"). According to Ms. Harrison, the ALJ could have only considered SSR 12-2p(a) when making her decision because it requires a physical examination. (Doc. 14 at 16). Ms. Harrison maintains that this was an error because a claimant can establish

---

[1] During the hearing before the ALJ, Ms. Harrison noted that she had trouble laying on her back because doing so would make her back hurt. (Doc. 6-3 at 48). But she did not allege that this pain was disabling or affected her ability to perform work related functions. (*See id.* 36–58). Thus, this statement is not an assertion that back pain was a basis for her disability.

a medically determinable impairment under SSR 12-2p(b), which does not require a physical examination. (*Id.*).

Whether SSR 12-2p(b) requires a physical examination is immaterial to this court's analysis. It is true that SSR 12-2p provides for a medically determinable impairment upon a diagnosis by a physician and evidence in the physician's treatment notes that satisfies the criterion set out in either SSR 12-2p(a) or SSR 12-2p(b). 77 Fed. Reg. 43640, at 43641. But as Ms. Harrison acknowledges, both SSR 12-2p(a) and (b) require evidence that other disorders that could cause the symptoms or signs were excluded. 77 Fed. Reg. 43640, at 43642-43643; *see also* Doc. 14 at 16-17.  As the ALJ noted here, Ms. Harrison has other severe impairments –cervical spondylosis and cervical radiculopathy--that could cause the fibromyalgia symptoms. (Doc. 6-3 at 22; *see also* SSR 12-2p (defining fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints").  And Ms. Harrison does not point to any evidence that supports the conclusion that the other symptoms she suffers are either associated with fibromyalgia or not caused by her other severe impairments. (Doc. 14 at 17; *see also* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").

2.    Depression

Ms. Harrison also argues that the ALJ erred at step two by finding that Ms. Harrison's depression was a non-severe impairment. (Doc. 14 at 14–15). But Ms. Harrison does not argue that the ALJ failed to consider her depression when determining her residual functioning capacity at step four. (*See id.*).

An ALJ's finding that an impairment is medically determinable but non-severe is harmless if the ALJ considers that impairment along with all others at later steps in the five-step analysis. *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, . . .  is enough to satisfy the requirement of step two."); *see also* 20 C.F.R. § 404.1523(c) (requiring that the ALJ consider "the combined effect of all of your impairments without regard to whether any such impairment if considered separately would be of sufficient severity"); *id*. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not severe, . . . when we assess your [residual functioning capacity].") (quotation marks omitted).

Here, the ALJ recognized Ms. Harrison's SVT, cervical spondylosis, cervical radiculopathy, and narcolepsy as severe impairments, which allowed her to proceed with the evaluation process. (*See* doc. 6-3 at 20; 27). And the ALJ considered Ms. Harrison's depression at step four when she determined Ms. Harrison's residual

functioning capacity. (*See id.* at 23 (noting that the ALJ "considered all symptoms to the extent these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"); *id.* at 25 (noting Ms. Harrison's "non-severe mental impairment" and comparing it to the "mental status examinations" in the record); *id.* (noting Dr. Rodrigues's and Dr. McIntyre's findings of a "non-severe mental impairment that caused a mild limitation in functioning" but was consistent with the "mental status evaluations" in the record). The ALJ's residual functioning capacity assessment makes clear she considered mental status examinations conducted in Ms. Harrison's evaluations from Pulmonary and Sleep Associates, an urgent care, and her OB-GYN. (*See* doc 6-3 at 25 (citing doc. 6-10 at 29–86)). Each of these sets of records includes at least one mental status examination that did not show depression. (Doc. 6-10 at 43–44, 48–49, 54, 70, 76–77, 82). Because the ALJ found at least one severe impairment and properly considered other impairments at subsequent steps, and Ms. Harrison does not argue that the ALJ failed to consider her depression when determining her residual functioning capacity at step four, and the ALJ considered her depression when making that determination, any error in finding Ms. Harrison's depression non-severe was harmless. *See Jamison*, 814 F.2d at 588.

### 3.    Ms. Harrison's Testimony

Ms. Harrison argues that the ALJ failed to properly evaluate Ms. Harrison's testimony about the extent and limiting effects of her pain and narcolepsy. (doc. 14 at 18–23).

During step four, the ALJ must determine the claimant's residual functioning capacity and will consider all evidence in the case record including the claimant's subjective symptoms. *See* 20 C.F.R. §§ 404.1520(a)(3), 404.1520(a)(4)(iv). An "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). A claimant can establish disability through testimony of pain or other subjective symptoms by showing evidence of an underlying medical condition and either (1) "objective medical evidence that confirms the severity of the alleged pain arising from that condition" or (2) "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Malak*, 131 F.4th at 1287 (quotation marks omitted).

"[W]hen a claimant's subjective complaints are inconsistent with medical and other evidence, an ALJ may discredit the claimant's statements." *Rodriguez v. Soc. Sec. Admin.*, 118 F.4th 1302, 1316 (11th Cir. 2024). But if "a claimant testifies as to his subjective complaints of disabling pain, and other symptoms, . . . the ALJ must clearly articulate explicit and adequate reasons for discrediting the claimant's

allegations of completely disabling symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks omitted). The credibility determination must be sufficient to enable the court "to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Id.* (first alteration in original) (quotation marks omitted).

The ALJ found that Ms. Harrison's "medically determinable impairments could reasonably be expected to cause some symptoms and/or function limitations," but the "allegations concerning the intensity, persistence, and limiting effects of these symptoms are inconsistent with the objective medical evidence, treatment regimen and response to treatment, and daily activities." (Doc. 6-3 at 23). Specifically, the ALJ relied on the lack of "ongoing or aggressive treatment" and the lack of evidence showing "any remarkable clinical findings on examination showing limitation to the degree alleged." (*Id.* at 24).

The ALJ relied on medical records that showed normal musculoskeletal, neurological, and physical examinations, the effectiveness of both oral pain medications and cervical epidural steroid injections, and Ms. Harrison's rejection of the recommended medicine and failure to obtain another. (Doc. 6-3 at 24). By citing to these inconsistencies, the ALJ has provided an explicit and adequate reason for discounting Ms. Harrison's statements this court may not substitute its judgment for

that of the Commissioner. *See Winschel*, 631 F.3d at 1178. Accordingly, the ALJ substantial evidence supports discrediting this portion of her testimony.

Ms. Harrison argues that the ALJ erred by failing to consider any potential justifications why Ms. Harrison did not obtain Wakix based on inferences that could be drawn from a line in one medical record indicated that Ms. Harrison was "trying" to obtain Wakix. (Doc. 14 at 22). The court will remand for further consideration "when the ALJ primarily if not exclusively relies on a claimant's failure to seek treatment, but does not consider any good cause explanation for this failure." *Henry*, 802 F.3d at 1268 (quotation marks omitted). But here, the ALJ did not "primarily" or "exclusively" rely on Ms. Harrison's failure to obtain Wakix in determining her disability, she cited the conservative management and normal examinations during the relevant period. *See Ellison v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003) (finding that an ALJ did not commit reversible error when failing to consider the reasons for a claimant's noncompliance because he did not significantly base his determination on a finding of noncompliance). The ALJ considered Ms. Harrison's refusal to take medication to treat her symptoms or to acquire Wakix, her failure to continue seeing sleep-treatment specialists, her diagnosis of narcolepsy without the transient attacks of weakness described as cataplexy, and her normal physical examinations from sleep specialists and other providers. (Doc. 6-3 at 24). Because the ALJ considered all of this evidence in coming to her decision, the ALJ did not

need to consider the potential reasons for her failure to take Wakix. *See Ellison,* 355 F.3d 1275. Accordingly, the court does not find that the ALJ erred in her discussion of Ms. Harrison's failure to obtain Wakix.

Ms. Harrison also argues that the ALJ erred by finding that Ms. Harrison's narcolepsy was conservatively managed because "narcolepsy is not curable" and she still has uncontrolled symptoms of narcolepsy. (Doc. 14 at 22–23). But the only records that Ms. Harrison cites are several quotations from her medical providers about her self-reported symptoms (*id*. at 23), but in looking past these symptoms, the ALJ relied on substantial evidence in coming to her decision (*see* doc. 6-3 at 23) (relying on to the prior effectiveness of medication, Ms. Harrison's refusal or failure to obtain medication, the conclusion of her treatment with sleep specialists, normal medical evaluations, and the presence of narcolepsy without cataplexy), and the court may not reweigh the evidence that Ms. Harrison points to at this stage, *see Winschel*, 631 F.3d at 1178.

Finally, Ms. Harrison argues that the ALJ erred by finding that Ms. Harrison had only a mild limitation in concentrating or maintaining pace. (Doc. 14 at 21). But the ALJ's determination that Ms. Harrison suffered from only a mild limitation is supported by the reports from Ms. Harrison's psychiatrist, who noted that Ms. Harrison exhibited poor focus and concentration, but did not find her concentration to be an impairment, and did not offer a diagnosis related to her

concentration (*see* 6-11 at 90–91). The finding is also supported by four mental health assessments from prior administrative medical findings concluding she either had mild limitations or that she could perform a range of light work. (Doc. 6-3 at 24–25). The ALJ's consideration of the prior administrative medical findings is permitted when she finds them persuasive. *See* 20 C.F.R. § 404.1520c(a). Here, the ALJ found these evaluations persuasive because they were consistent with several mental status examinations in Ms. Harrison's medical records that did not reveal any abnormalities in her concentration. (Doc. 6-3 at 25) (citing doc. 6-10 at 44, 49, 54, 70, 77, 82). Accordingly, the ALJ's decision to find that Ms. Harrison suffered from only a mild limitation of her concentration is supported by substantial evidence.

### V.    CONCLUSION

The court **WILL AFFIRM** the Commissioner's final decision. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 26, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE